UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| SECURITIES AND EXCHANGE COMMISSION,<br>100 F Street, N.E.<br>Washington, D.C.  20549<br>　　　　　　　　　　　　Plaintiff,<br><br>　　　　　v.<br><br>GARY K. BENNETT,<br>　　　　　　　　　　　　Defendant. | Civil Action No. _____ |

## COMPLAINT

Plaintiff, the United States Securities and Exchange Commission, alleges as follows:

### SUMMARY

1.　　This is an action against defendant Gary K. Bennett ("Bennett") for violating anti-fraud and other provisions of the federal securities laws in connection with the issuance of materially inaccurate financial information and the failure to maintain accurate books, records, and accounts by Gerber Scientific, Inc. ("Gerber" or "Company").

2.　　While Gerber was preparing its annual report on Form 10-K for fiscal year 2000, Bennett, Gerber's chief financial officer ("CFO"), learned that in the fourth quarter of fiscal year 2000, Gerber had failed to record $1.5 million of a $6.2 million decrease in the book value of the inventory of the Company's largest subsidiary, Gerber Scientific Products ("GSP"). Notwithstanding that Gerber had failed to record the $1.5 million,

Gerber did not correct its previously issued May 2000 press release in which it represented that it had taken a $6.2 million charge and in which Gerber's reported earnings reflected that it had taken the full amount of the charge. Gerber then filed its annual report on Form 10-K with materially inaccurate financial results and related disclosures.

3. Bennett knew or was reckless in not knowing that, as a result of the failure to record the $1.5 million, Gerber's May 2000 press release became materially inaccurate and that the Company's annual report on Form 10-K contained materially inaccurate financial results and related disclosures. Bennett nevertheless signed the Form 10-K and failed to take any steps to correct the May 2000 press release. In addition, Bennett failed to provide material information to Gerber's auditor by signing a "subsequent events" letter to the auditor that omitted any reference to the $1.5 million error. Bennett further participated in the decision to improperly amortize the $1.5 million over the four quarters of fiscal year 2001.

4. Separate and apart from the inventory issue, Gerber established certain liability ("reserve") accounts for unspecified contingencies and for amounts for which it lacked support. Gerber's establishment, maintenance, and subsequent misuse of these reserves were not in conformity with generally accepted accounting principles ("GAAP") and resulted in both overstatements and understatements of net earnings in fiscal years 1998 and 1999. Bennett knew of and allowed the misuse of these reserves.

5. As a result of the failure to record the $1.5 million error and the improper establishment, maintenance, and use of reserves, Gerber's financial statements filed with the Commission from at least as early as fiscal year 1998 and as late as its fiscal quarter

2

ended January 31, 2002, were materially misstated and not in conformity with generally accepted accounting principles ("GAAP"). As a result of his actions through the date of his departure in June 2001, Bennett violated or aided and abetted violations of anti-fraud, reporting, and record-keeping provisions of the Securities Exchange Act of 1934 ("Exchange Act"). Accordingly, the Commission seeks a final judgment (a) permanently enjoining Bennett from violating Section 10(b) of the Exchange Act and Exchange Act Rules 10b-5 and 13b2-2(a) and from aiding and abetting violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act and Exchange Act Rules 12b-20, 13a-1, 13a-13; (b) imposing a civil penalty; (c) barring Bennett from serving as an officer or director of a public company; and (d) granting such other relief as the Court deems appropriate.

## JURISDICTION AND VENUE

6. This Court has jurisdiction over this action under Sections 21(d)(1), 21(e), and 27 of the Exchange Act [15 U.S.C. §§ 78u(d)(1), 78u(e), and 78aa]. Venue is proper under Section 27 of the Exchange Act [15 U.S.C. §§ 78aa] because certain of the acts, practices, and courses of business alleged in this Complaint occurred within this District.

## DEFENDANT

7. Gary Bennett, age 54, was Gerber's CFO from August 1996 through June 2001. He resigned in June 2001. Previously, Bennett was licensed as a certified public accountant in Connecticut for a period of time in 1980. Bennett currently resides in Durham, Connecticut.

## RELEVANT ENTITY

8.   Gerber, a Connecticut corporation, is a provider of sign-making, specialty graphics, apparel and flexible materials, and optical lens processing goods and services, operating through several subsidiaries. At all relevant times, Gerber conducted its business primarily through four subsidiaries: GSP; Gerber Technology, Inc.; Gerber Coburn Optical, Inc.; and Spandex PLC. During that time, Gerber used a fiscal year that ended on April 30. Also during that time, Gerber's stock was registered with the Commission under Section 12(b) of the Exchange Act [15 U.S.C. § 78l(b)] and was traded on the New York Stock Exchange.

## FACTUAL ALLEGATIONS

**Failure to Record $1.5 Million of a $6.2 Million Charge for an Inventory Overstatement**

9.   By late February 2000, Bennett and other members of Gerber's senior management were aware of a large discrepancy between the value of GSP's physical inventory and the value of its inventory as recorded on its books. As a result, Gerber senior management ordered an expanded annual review of GSP's physical inventory. In early April 2000, before the discrepancy between the physical and book inventory amounts had been resolved, GSP's finance officer abruptly, and without explanation, left the Company. Shortly thereafter, Gerber senior management engaged a special internal audit team, lead by Gerber's controller, Bernard Demko ("Demko"), to determine the precise nature and amount of the inventory discrepancy.

10.   By April 25, 2000, Demko informed Bennett that GSP's inventory was overstated by approximately $6 million.

11. On April 26, 2000, Gerber issued a press release disclosing that it would record a charge of approximately $6 million to write down the value of its inventory. The Company reported that the earnings impact of the charge would be approximately $.17 per share and that, before any restructuring charges, it expected earnings for the fourth quarter of fiscal year 2000 to be reduced to $.08 to $.12 per share and earnings for the year to be reduced to $1.16 to $1.20 per share. Prior to the release, analyst expectations for Gerber had been $.42 per share for the fourth quarter and $1.50 per share for the year.

12. Following the issuance of the April 26, 2000, press release, Gerber's stock price dropped 25%, from a close of $15.44 on April 25, 2000, to a close of $11.50 on April 26, 2000.

13. By early May 2000, the special audit team informed Bennett and others that the amount of the inventory overstatement was $6.2 million as of March 25, 2000. Shortly thereafter, employees responsible for recording the adjustment prepared a reconciliation of the difference between the value of the inventory recorded on Gerber's books and the results of the physical inventory. As a result of a clerical error, however, the reconciliation reflected only a $4.7 million difference. On May 19, 2000, Company employees recorded the inventory adjustment. As a result of the error in the preparation of the reconciliation, the Company inadvertently recorded a charge of only $4.7 million rather than $6.2 million, a difference of $1.5 million.

**The May 25, 2000, Press Release**

14. On May 25, 2000, Gerber issued a press release announcing its results for the fourth quarter and year ended April 30, 2000, and announcing the amount of the

charge for the inventory adjustment. The Company reported net earnings of $1.7 million, or $.08 per share, for the fourth quarter and net earnings of $25.9 million, or $1.16 per share, for the year. Gerber gave the inventory charge of $0.18 per share as one of two principal reasons why its earnings for the quarter were lower than the prior year's fourth quarter earnings. The Company further stated that, without the write-down, per share earnings for the year would have been $1.34 and thus would have exceeded the prior year's earnings of $1.29 per share.

15.    Because Gerber had recorded only $4.7 million of the $6.2 million inventory charge, its financial results reported in the May 25, 2000, press release were materially inaccurate. Had Gerber recorded the entire $6.2 million charge, it would have had quarterly earnings of only $725,000, or $.04 per share, and annual earnings of only $24.9 million, or $1.12 per share – well below Gerber's April 26, 2000, earnings forecast range of $.08 to $.12 per share for the quarter and $1.16 to $1.20 for the year. Similarly inaccurate was Gerber's statement that it had recorded a $6.2 million charge because, in fact, Gerber had only recorded $4.7 million of the full $6.2 million.

**Discovery and Concealment of the 1.5 Million Error**

16.    In June 2000, well over one month before Gerber filed its annual report on Form 10-K for fiscal year 2000, Gerber employees discovered the $1.5 million error in the inventory charge and informed Demko of the mistake. Demko and another employee then informed Gerber's chief executive officer, Michael Cheshire ("Cheshire"). Cheshire instructed Demko and the other employee to inform Bennett, who was on vacation, of the error.

17. While Bennett was on vacation or shortly after his return in early July 2000, Demko told Bennett of the error.

18. After Bennett returned from vacation, Bennett, Cheshire, and Demko discussed how to handle the $1.5 million error. The result of these discussions was that Gerber would amortize the error over the four quarters of fiscal year 2001, which is what the Company subsequently did.

19. After learning of the $1.5 million error, Bennett signed a subsequent events letter, dated July 27, 2000, to Gerber's auditor stating that, subsequent to a May 24, 2000, management representation letter, no information had come to management's attention that would cause management's prior representations to be modified and that no events had occurred subsequent to May 24, 2000, that would require adjustment to or disclosure in the Company's financial statements. The letter omitted any reference to the $1.5 million error and the resulting failure to record all of the $6.2 million charge.

20. On July 27, 2000, Gerber filed its annual report on Form 10-K for fiscal year 2000. The Form 10-K included financial statements that reported the same results that the Company had reported in its May 25, 2000, press release. Those results did not include $1.5 million of the $6.2 million charge required to write down the value of GSP's inventory. Although the financial results included only $4.7 million of the charge, the Company, in footnotes to the financial statements and other disclosures in the Form 10-K, misrepresented that it had recorded the entire $6.2 million charge. As a result of the failure to record the $1.5 million, the Company's reported earnings for the fourth quarter were overstated by 100% and reported earnings for the year were overstated by 3.5%.

The misstatements in the Form 10-K resulting from the failure to record the $1.5 million were material.

21. Bennett signed Gerber's annual report on Form 10-K for fiscal year 2000. When he signed the Form 10-K, Bennett knew or was reckless in not knowing that the Form 10-K contained the material misstatements described in paragraph 20 above.

22. Bennett also knew or was reckless in not knowing that, as a result of the failure to record the $1.5 million of the $6.2 million charge required to write down the value of GSP's inventory, Gerber's May 25, 2000, press release was materially misleading for the reasons described in paragraph 15 above. Bennett took no action to correct the press release.

23. In August 2000, Gerber began amortizing the $1.5 million error in equal installments over all four quarters of fiscal year 2001. Amortization of the error was inconsistent with GAAP. Bennett knew or was reckless in not knowing that amortization was improper.

**Improper Establishment and Use of Corporate Reserves**

24. In approximately 1986, Gerber established accounts receivable and inventory reserves on its corporate level books ("corporate reserves"). When Gerber established these reserves and at all relevant times thereafter, it did not have accounts receivable or inventory held at the corporate level, and the corporate reserves were not established to provide for a specific contingency at any of the Company's subsidiaries.

25. The establishment of the corporate reserves, because they were for general or unspecified contingencies, was inappropriate under GAAP. Subsequent to their establishment, Bennett was responsible for their maintenance and signed annual

memoranda that authorized the amount of the corporate reserves through fiscal year 1998. Bennett knew that the company did not have accounts receivable or inventory at the corporate level and that Gerber did not maintain the corporate reserves for specific contingencies at the subsidiary level.

26. The corporate reserves remained at a relatively constant level, totaling approximately $4 million, until fiscal year 1998. During fiscal year 1998, Gerber used $2 million of the corporate reserves to reduce a variety of expenses that it otherwise would have had to record for its Gerber Coburn subsidiary, including expenses related to a company that Gerber had acquired during fiscal year 1998.

27. During fiscal year 1999, Gerber used the remaining $2 million of corporate reserves to offset additional Gerber Coburn expenses.

28. These uses of the corporate reserves were not in conformity with GAAP and resulted in an overstatement of net earnings of $.06 per share for fiscal year 1998 and of $.06 per share for fiscal year 1999. Bennett approved Gerber's uses of the corporate reserves when he knew or was reckless in not knowing that these uses were not in conformity with GAAP.

**Improper Reserve Recorded in Connection with the Sale of a Subsidiary**

29. In March 1998, Gerber sold one of its subsidiaries. In connection with that sale, the Company recorded a "non-recurring special charge" in the amount of $25 million to write down the value of certain assets of the subsidiary. Part of that charge was used to establish a reserve of approximately $4.2 million ostensibly for unfulfilled customer obligations and other potential liabilities ("subsidiary sale reserve"). When

9

Gerber recorded the charge, however, the Company lacked support for the reserved amount.

30. During fiscal year 1999, Gerber used the subsidiary sale reserve for approximately $1.2 million of costs related to the sale of the subsidiary. The Company, however, also used the reserve to offset $1 million of unrelated severance costs.

31. While it was preparing its annual report on Form 10-K for fiscal year 1999, Gerber and the purchaser of the subsidiary resolved their outstanding claims against one another. The resolution of the claims ended any basis for Gerber to maintain the subsidiary sale reserve on its books. The Company reversed the remaining $2 million reserve balance into income for fiscal year 1999, which increased Gerber's reported income for that year.

32. Establishing a reserve without support for the amount recorded and using a reserve for purposes unrelated to the purpose for which the reserve was established are not allowed under GAAP. Gerber's establishment and subsequent uses of the reserve thus were not in conformity with GAAP and resulted in an understatement of net earnings of $.10 per share for fiscal year 1998 and an overstatement of net earnings of $.09 per share, for fiscal year 1999. Bennett knew or was reckless in not knowing that the establishment and use of the subsidiary sale reserve were not in conformity with GAAP but nevertheless approved both the establishment and use of that reserve.

**Gerber's Restatement**

33. On August 27, 2002 Gerber filed its annual report on Form 10-K for its fiscal year ended April 30, 2002. In that Form 10-K, Gerber included restated financial statements for its fiscal years ended April 30, 2000, and April 30, 2001, and for the seven

quarters ended January 31, 2002. The Company also restated its retained earnings as of April 30, 1999. Among other things, the Company included a restatement for its failure to record the $1.5 million in the fourth quarter of 2000 and the Company's improper establishment and use of the corporate reserves and the reserves for the sale of the subsidiary.

## CLAIMS FOR RELIEF

## FIRST CLAIM

**Violation of Section 10(b) of the Exchange Act and Exchange Act Rule 10b-5**

34. Paragraphs 1 through 23 and 33 are re-alleged and incorporated herein by reference.

35. Bennett, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange, and in connection with the purchase or sale of any security:

   a. Employed devices, schemes, or artifices to defraud;

   b. Made untrue statements of a material fact or omitted to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading; or

   c. Engaged in acts, practices, or courses of business which operated or would operate as a fraud or deceit upon other persons.

36. As set forth more fully above, Bennett acted knowingly or recklessly in (1) signing Gerber's annual report on Form 10-K for fiscal year 2000 with material misstatements resulting from the failure to record $1.5 million of the $6.2 million charge for the inventory overstatement and (2) failing to take action to correct Gerber's May 25,

2000, press release that became materially inaccurate because of the failure to record the $1.5 million.

37. By engaging in the foregoing conduct, Bennett violated Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rule 10b-5 [17 C.F.R. § 240.10b-5].

## SECOND CLAIM

### Violation of Exchange Act Rule 13b2-2(a)(2)

38. Paragraphs 1 through 23 and 33 are re-alleged and incorporated herein by reference.

39. Bennett, directly or indirectly, omitted to state, or caused another person to omit to state, material facts necessary in order to make statements made, in light of the circumstances under which such statements were made, not misleading to accountants in connection with (a) an audit, review or examination of the financial statements of the issuer required to be made pursuant to the Exchange Act rules and regulations or (b) the preparation or filing of any document or report required to be filed with the Commission pursuant to the Exchange Act rules and regulations.

40. As set forth more fully above, Bennett signed the July 27, 2000, letter to Gerber's auditor that omitted any reference to the failure to record the $1.5 million of the $6.2 million charge for the inventory overstatement.

41. By engaging the conduct described above, Bennett violated Exchange Act Rule 13b2-2(a)(2) [17 C.F.R. § 240.13b2-2(a)(2)].

## THIRD CLAIM

### Aiding and Abetting Violations of
### Section 13(a) of the Exchange Act and
### Exchange Act Rules 12b-20, 13a-1 and 13a-13

42.   Paragraphs 1 through 33 are re-alleged and incorporated herein by reference.

43.   Gerber violated Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 17 C.F.R. § 240.13a-1, and 17 C.F.R. § 240.13a-13] by filing with the Commission, during the periods from 1998 through the quarter ended January 31, 2002, annual and quarterly reports on Forms 10-K and 10-Q that contained financial statements that did not conform with GAAP and that contained other material misstatements resulting from (1) the failure to record $1.5 million of the $6.2 million charge for the inventory overstatement and (2) the improper establishment, maintenance, and use of the corporate reserves and the subsidiary sale reserve.

44.   As set forth more fully above, Bennett, through the date of his departure in June 2001, knowingly provided substantial assistance to Gerber in its violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 17 C.F.R. § 240.13a-1, and 17 C.F.R. § 240.13a-13].

45.   By engaging in the conduct described above, Bennett aided and abetted Gerber's violations of Section 13(a) of the Exchange Act [15 U.S.C. § 78m(a)] and Exchange Act Rules 12b-20, 13a-1, and 13a-13 [17 C.F.R. § 240.12b-20, 17 C.F.R. § 240.13a-1, and 17 C.F.R. § 240.13a-13].

## FOURTH CLAIM

### Aiding and Abetting Violation of
### Sections 13(b)(2)(A) of the Exchange Act

46. Paragraphs 1 through 33 are re-alleged and incorporated herein by reference

47. Gerber violated Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)] by failing to record the $1.5 million of the $6.2 million inventory overstatement and by establishing, maintaining, and using reserves for which it lacked support and thus failed to make and keep books, records, and accounts that in reasonable detail accurately and fairly reflected its transactions and dispositions of its assets.

48. As set forth more fully above, Bennett knowingly provided substantial assistance to Gerber in its violation of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

49. By engaging in the conduct described above, Bennett aided and abetted Gerber's violations of Section 13(b)(2)(A) of the Exchange Act [15 U.S.C. § 78m(b)(2)(A)].

## PRAYER FOR RELIEF

WHEREFORE, the Commission respectfully requests that the Court enter judgment:

a. permanently enjoining Bennett, his agents, servants, employees, representatives, attorneys, affiliates and all persons in active concert or participation with them who receive actual notice of the Court's judgment, from violations of Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Exchange Act Rules 10b-5 [17 C.F.R. § 240.10b-5] and 13b2-2(a) [17 C.F.R. § 240.13b2-2(a)] and from aiding and abetting

14

violations of Sections 13(a) and 13(b)(2)(A) of the Exchange Act [15 U.S.C. §§ 78m(a) and78m(b)(2)(A)] and Exchange Act Rules 12b-20, 13a-1 and 13a-13 [17 C.F.R. §§ 240.12b-20, 240.13a-1, 240.13a-13);

b.   imposing monetary penalties under Section 21(d)(3) of the Exchange Act [15 U.S.C. § 78u(d)(3)];

c.   prohibiting Bennett, pursuant to Section 21(d)(2) [15 U.S.C. § 78u(d)(2)] of the Exchange Act, from acting as an officer or director of any issuer that has a class of securities registered pursuant to Section 12 of the Exchange Act [15 U.S.C. § 78l] or that is required to file reports pursuant to Section 15(d) of the Exchange Act [15 U.S.C. § 78o(d)]; and

d.   granting the Commission such further relief as the Court deems appropriate.

Respectfully submitted,

Scott Friestad
Laura B. Josephs (DC Bar Bo. 414519)
Donald N. Dowie
Thomas D. Silverstein (DC Bar No. 256362)
Daniel A. Weinstein

Attorneys for Plaintiff
Securities and Exchange Commission
100 F. Street, N.W.
Washington, D.C. 20549
Telephone: (202) 551-4501 (Weinstein)
Fax: (202) 772-9231

Dated: 7/26/05